March 22, 2018

**Supreme Court**

No. 2014-231-C.A.
(P1/11-2541AG)

State                           :

     v.                         :

Leron Porter.                   :

NOTICE:    This opinion is subject to formal revision before
publication in the Rhode Island Reporter.  Readers are requested to
notify the Opinion Analyst, Supreme Court of Rhode Island,
250 Benefit Street, Providence, Rhode Island 02903, at Telephone
222-3258 of any typographical or other formal errors in order that
corrections may be made before the opinion is published.

State                      :

v.              :

Leron Porter.          :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.** The defendant, Leron Porter, is before the Supreme Court on appeal from a judgment of conviction after being found guilty of: (1) second-degree murder (count one); (2) discharging a weapon while committing a crime of violence (count two); and (3) possession of a firearm, having been previously convicted of a felony (count four). The trial justice denied the defendant's motion for a new trial and, on March 6, 2014, sentenced the defendant to life imprisonment on count one, a consecutive term of life imprisonment on count two, and a consecutive term of ten years to serve on count four. The trial justice also declared the defendant to be a habitual offender and imposed an additional consecutive term of twenty-five years to serve, of which fifteen years must be served before he is eligible for parole.[1]

On appeal, defendant argues that the trial justice erred when she denied his motion for a new trial and refused to pass the case after a spectator's outburst. The defendant also asserts

---

[1] These sentences reflect the pronouncement by the trial justice at sentencing. The judgment of conviction is incorrect. We therefore remand the case with directions to enter a corrected judgment of conviction.

several *Batson*[2] challenges in connection with the selection of the jury.  We affirm the judgment of conviction.

### Facts and Travel

A feud between two women over one man and an ensuing brawl led to the senseless murder of Tiphany Tallo (Tiphany or the decedent), a teenage girl.  In May 2011, Debryonna Fortes (Debryonna) was residing in a multifamily building located at 17-19 Spruce Street in Providence, Rhode Island, along with Wendy Tallo (Wendy) and her two daughters, Ashley Tallo (Ashley) and Tiphany.  Debryonna's boyfriend, Jermaine, and Ashley's boyfriend, Brandon Crumady (Brandon), also were living in the same apartment.

On May 9, 2011, Ashley, Debryonna, Brandon, and Jermaine were heading to Oakland Beach in Warwick for the afternoon when they decided to make a brief stop at a store located on Atwells Avenue in Providence, during which Ashley ran into Danessa "Mooky" Porter (Mooky). Ashley and Mooky shared a strained and contentious relationship due to Mooky's involvement with Ashley's boyfriend Brandon.  The two exchanged words; Mooky kicked Ashley, and Ashley responded by punching Mooky in the face and tearing her shirt.  After this encounter, the parties retreated to their respective vehicles and left the area; the plan to visit Oakland Beach was abandoned, and Ashley and Debryonna returned to 19 Spruce Street, where a melee subsequently erupted, culminating in this homicide.

Once home, Ashley and Debryonna discussed the incident with Wendy and Tiphany. The four women then decided to join their neighbors, Sherissa and Kaleena Monroe, Loretta Gonzalez, and Ashley Turner (the neighbors), at a spot they frequented in the front of the building.  Two vehicles—one red and one black—appeared on Spruce Street, and headed

---

[2] *Batson v. Kentucky*, 476 U.S. 79 (1986).

towards the apartment building.  There were five persons in the red vehicle and three persons in the black vehicle; all were female except for a lone male, later identified as defendant, who is Mooky's brother.

The vehicles stopped in front of a church on Spruce Street.  Mooky immediately exited the red vehicle and approached Ashley in a loud and aggressive manner.  Mooky cursed at Ashley and insulted Ashley's son, while flaunting her sexual relationship with Brandon.  Not to be outdone, Ashley charged toward Mooky and attempted to strike her, but was elbowed in the face by defendant.  At this point a street fight between Ashley and Mooky ensued. Although there were no weapons, Ashley was outnumbered.  According to the witnesses, as the fight progressed to the yard of the nearby church, Ashley had the best of Mooky, at which point Mooky's compatriots joined the fray.  The women produced two knives and a baseball bat that was enhanced with nails.  Ashley was stabbed, beaten with the bat, kicked, and punched.  At some point, defendant pulled a firearm from his waistband, causing Debryonna and Tiphany to move toward Ashley.  Witnesses testified that as Debryonna and Tiphany began to run toward the fight, defendant raised his gun and fired the weapon in their direction.  Immediately after, Tiphany placed her hand on her chest, began to retreat to the apartment building, and collapsed.  According to Debryonna, defendant passed the gun to another female—Asia Porter—then ran to the red vehicle and fled the scene. The remaining participants followed in the second car. Tiphany was transported to the hospital, where she was pronounced dead.  The manner of death was homicide.  She was seventeen years old.

Providence Police Officer Ricardo Silva was the first officer to arrive on the scene; he responded within minutes of the shooting.  Based on information he obtained from the witnesses, an alert including the vehicles, license plates, and the direction the vehicles traveled was

broadcast throughout the city. Detective Kris Poplakski (Det. Poplakski) and Detective Patrick Potter (Det. Potter) heard the broadcast for a "[r]ed Impala with out of state plates."[3] Shortly thereafter, the detectives saw a vehicle that matched the description pass directly in front of them on Pleasant Valley Parkway. The detectives stopped the vehicle and confronted one male driver and five female passengers.[4] The male driver was identified as defendant; Mooky also was in the car.[5] Detective Poplakski testified that defendant was sweating profusely, and the female passengers "couldn't sit still, any of them. They were bouncing in the back seat nervously." Detective Poplakski testified that he also found a purse, a dark navy blue Yankees baseball cap, and a wooden bat embedded with several nails. Within an hour of the homicide, multiple witnesses—most of whom were neighbors and eyewitnesses—identified defendant as the shooter.

The defendant was arrested and charged by indictment with the murder of Tiphany Tallo, in violation of G.L. 1956 §§ 11-23-1 and 11-23-2; discharging a firearm while committing a crime of violence, to wit, murder, in violation of G.L. 1956 § 11-47-3.2(b)(3); possession of a firearm, having been previously convicted of a crime of violence, in violation of G.L. 1956 § 11-47-5; and assault upon Ashley Tallo with a dangerous weapon, to wit, a firearm, in violation of

---

[3] The license plate indicated that the red car had a Connecticut registration.

[4] The second vehicle, described as a black Impala, was later found at the home of defendant's mother's goddaughter, Renee Sparfven (Sparfven). At first, Sparfven claimed that the vehicle did not move from her house on the day in question and that she did not have any information. However, by agreement not to prosecute her for obstruction, Sparfven changed her story and promised to tell the truth at trial. Sparfven later testified at trial that she was planning to remove the license plates from the vehicle.

[5] The other female passengers were identified as Asia Porter, Breona Porter, Yelica DeJesus, and Reanel Cassell.

G.L. 1956 § 11-5-2 (count six).[6]  When the case was reached for trial, the pretrial motions and jury selection were conducted by a justice of the Superior Court, but a second justice presided over the trial itself.  The trial spanned more than seventeen days and the jury heard from eight eyewitnesses.  On December 6, 2013, the jury declared defendant guilty of murder in the second degree and the two firearm offenses.  The defendant was acquitted on the count charging him with assault with a dangerous weapon upon Ashley Tallo.  He timely appealed.

**Analysis**

Before this Court, defendant raises multiple issues.  First, defendant challenges his conviction based on two alleged *Batson* violations by the first justice when he permitted the state to exercise two peremptory challenges during the jury selection.  The defendant further contends that the trial justice improperly restricted the cross-examination of a witness about a gun the witness saw at some point before the murder.  Next, defendant argues that the trial justice abused her discretion by denying defendant's motion to pass the case after an emotional outburst during the defense's opening statement.  Finally, defendant asserts that the trial justice erred by denying his motion for a new trial.

---

[6] The defendant was also charged with assault upon Wendy Tallo with a dangerous weapon, to wit, a firearm, in violation of G.L. 1956 § 11-5-2 (count three); conspiracy to commit assault with a dangerous weapon, in violation of G.L. 1956 § 11-1-6 (count five); assault upon Ashley Tallo with a dangerous weapon, to wit, a knife, in violation of § 11-5-2 (count seven); assault upon Ashley Tallo with a dangerous weapon, to wit, a wooden club, in violation of § 11-5-2 (count eight); and assault upon Ashley Tallo with a dangerous weapon, to wit, a shod foot, in violation of § 11-5-2 (count nine). The state later dismissed these charges before trial, pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure.

# I

## *Batson* Violations

During jury selection, the state exercised peremptory challenges to strike two prospective jurors: Juror 216, a juror of Hispanic descent, and Juror 103, an African American. The defendant objected to both peremptory challenges, citing to *Batson v. Kentucky*, 476 U.S. 79 (1986). The defendant now contends that the first trial justice erred by allowing the state to strike the two prospective minority jurors.

Included in the rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution is a guarantee "that the [s]tate will not exclude members of his [or her] race from the jury venire on account of race[.]" *State v. Pona*, 66 A.3d 454, 472 (R.I. 2013) (*Pona II*) (quoting *State v. Pona*, 926 A.2d 592, 601 (R.I. 2007) (*Pona I*)). The United States Supreme Court, in *Batson*, established a tripartite test to determine whether a defendant has been deprived of this constitutional guarantee by a prosecutor's wrongful exercise of a peremptory challenge. *Batson*, 476 U.S. at 96-98; *see also Pona II*, 66 A.3d at 472.

The first step in the three-prong *Batson* analysis requires that the defendant "establish a *prima facie* case of purposeful discrimination[.]" *Pona II*, 66 A.3d at 472 (quoting *Pona I*, 926 A.2d at 601); *see also Batson*, 476 U.S. at 96. A *prima facie* case of purposeful discrimination is based on the "totality of the relevant facts [which give] rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 94. However, "[t]his step of the analysis will become moot if the trial justice moves beyond it to consider the second and third steps." *State v. Gallop*, 89 A.3d 795, 805 (R.I. 2014); *see also Hernandez v. New York*, 500 U.S. 352, 359 (1991) ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of

whether the defendant had made a prima facie showing becomes moot."); *State v. Austin*, 642 A.2d 673, 678 (R.I. 1994) ("Because the trial justice below similarly ruled on the ultimate question of intentional discrimination, we need not determine whether the exclusion from the jury of the only black person in the jury panel establishes a prima facie showing that the prosecutor exercised the state's peremptory challenge on the basis of race. We instead need only determine whether the trial justice erred in accepting the prosecutor's race-neutral reason for excluding the prospective juror.").

Under the second step of the *Batson* test, the burden shifts to the prosecution to "articulate its race-neutral reason(s) for challenging that particular juror." *Pona II*, 66 A.3d at 472 (quoting *State v. Price,* 706 A.2d 929, 935 (R.I. 1998)). The prosecutor cannot satisfy this burden by merely "denying that he [or she] had a discriminatory motive or [affirming] [his or her] good faith in making individual selections." *Pona I*, 926 A.2d at 602 (internal quotation marks omitted) (quoting *Batson,* 476 U.S. at 98). During the second step of a *Batson* analysis, "the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* (quoting *Hernandez*, 500 U.S. at 360); *see also Purkett v. Elem*, 514 U.S. 765, 767-68 (1995) ("The second step of this process does not demand an explanation that is persuasive, or even plausible."). Finally, the third step requires the trial justice "to determine whether the defendant has carried his or her burden of proving purposeful racial discrimination." *Pona II*, 66 A.3d at 472 (quoting *Price*, 706 A.2d at 935). "There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." *Pona I*, 926 A.2d at 602 (quoting *Hernandez*, 500 U.S. at 365). This determination rests with the trial justice.

Accordingly, "[t]he trial justice's evaluation of the prosecutor's state of mind is accorded great deference." *State v. Nichols*, 155 A.3d 1180, 1191 (R.I. 2017) (quoting *Pona II*, 66 A.3d at 472). Therefore, the "ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Pona II*, 66 A.3d at 472 (quoting *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008)).

The state sought to remove Juror 216 because of the juror's demeanor during the empaneling process. Although Juror 216 stated that she could be fair and impartial, it was the state's position that she exhibited a general lack of interest in the proceedings; the prosecutor expressed concerns about the juror's lack of attention and her failure to make eye contact during the voir dire. Specifically, the state explained:

> "[W]e have seen on continuous occasions where she has not made eye contact specifically with me when I'm questioning her. Her head is down when I'm questioning other jurors and with her, she's closing her eyes at times, and doesn't appear to be paying attention, specifically when I'm making inquiry of other jurors."

Defense counsel objected to the state's comments and argued that the state's alleged race-neutral reason for requesting the dismissal of Juror 216 was not supported, nor did defense counsel share the same observations of the juror's demeanor. In contrast, the trial justice expressed similar concerns about Juror 216's demeanor. The trial justice reasoned:

> "There have been occasions when I have noticed that [Juror 216's] eyes were closed. I can't say that she was asleep. But [the state's] concern of her lack of attention and/or disinterest are things that I find as credible commentary from him, and I have shared some of those same observations, and I'm satisfied that the offering that he has made to explain his reasons for dismissing a juror are not pretextual, and that the juror is not being excused for ethnic reasons at all * * *."

Juror 103, an institutional attendant at the Eleanor Slater Hospital—a state hospital that cares for certain inmates from the Adult Correctional Institutions (ACI) as well as forensic

patients—also was challenged by the state. At the outset, after his number was drawn Juror 103 raised a *sua sponte* request for a sidebar with the trial justice, in order to express his concerns about potential retaliation that he could experience in the course of his employment, regardless of the jury's verdict. Juror 103 stated:

> "We have forensic patients and behavioral patients * * * that follow these cases * * * and word goes around. Being a juror is public information. They'll get information. * * * [W]e also, as I said, have inmates from the ACI there. So chances are, regardless which way [the verdict] goes, I can find myself subject of either allegations or hostile treatment either from the staff or from patients."

Based on the concerns raised by Juror 103, the state subsequently exercised a peremptory challenge. In response, defendant's counsel objected to the challenge, arguing that Juror 103 is an "articulate, well-defined, apparently, African male, who has indicated, without question, that he could be fair and impartial to both the State and to the defendant." However, based on the circumstances and evidence before him, the trial justice granted the state's peremptory challenge and excused Juror 103 from the panel. The trial justice reasoned:

> "[Juror 103], at the very outset when his name was called, declined to take his seat in the jury box and immediately asked to come to the bench, and his first comments to us clearly indicated that he wanted to be excused. He * * * [d]oes not want to be here. He explained to us the concerns he has that there will be some kind of repercussion at the workplace, regardless of what the verdict is, the result of the deliberations.
>
> "I also have a concern that this man's explanations about his workplace situation would be shared with other jurors. That's something that might inject into the deliberations * * *."

Before this Court, defendant argues that the trial justice erred by granting the state's peremptory challenges as to Jurors 216 and 103, and contends that the state failed to offer a valid race-neutral reason for challenging the two jurors. We begin our analysis by concluding that the

first prong of the *Batson* test has been met as to both Juror 216 and Juror 103, because the trial justice acknowledged that the jurors are of minority descent, considered the prosecution's race-neutral reasons for each strike, and entertained defendant's objections. Thus, "the preliminary issue of whether * * * defendant had made a prima facie showing [became] moot." *Austin*, 642 A.2d at 678 (quoting *Hernandez*, 500 U.S. at 359).

To satisfy the second step of a *Batson* analysis, the state was required to proffer a race-neutral reason for its peremptory strike. *See Pona II*, 66 A.3d at 472. In the case of Juror 216, the state rested its peremptory challenge on the juror's demeanor, which, the prosecutor contended, exhibited inattention and a general lack of interest in the proceedings. In regard to Juror 103, the prosecutor reasoned that a strike was necessary based on Juror 103's concerns—raised at the outset—about potential retaliation he could face as a juror in this case. We have little difficulty concluding that the state's reasoning for challenging both jurors qualifies as race-neutral and nonpretextual. In each instance, the challenge was "based on something other than the race of the juror." *Hernandez*, 500 U.S. at 360. Thus, we find no error in the trial justice's conclusion that the state's explanation for each challenge could qualify as a race-neutral reason for excusing the juror.

Under the third step, the Court is tasked with determining whether the trial justice properly concluded that the race-neutral reasons for the strike did not amount to purposeful discrimination. As to Juror 216, this Court has previously held that the demeanor of a juror that impacts a juror's interest and attentiveness is a valid race-neutral reason for a peremptory strike. *See State v. Holley*, 604 A.2d 772, 778 (R.I. 1992) (upholding the prosecutor's peremptory strike based on the prosecutor's concerns of the only black juror's demeanor and ability to follow the trial justice's instructions). Moreover, we note the trial justice's statement that he made the same

observations of Juror 216's demeanor as the prosecutor: "[t]here have been occasions when I have noticed that her eyes were closed * * *. [The prosecutor's] concern of her lack of attention and/or disinterest are things that I find as credible commentary from him, and I have shared those same observations." We see no error in the trial justice's determination that the state's reasoning was race-neutral, and we therefore conclude that his decision to excuse Juror 216 was proper.

We pause briefly to address defendant's request that this Court conduct a comparative juror analysis. For the first time on appeal, defendant argues that the state's demeanor-based challenge in regard to Juror 216 is racially discriminatory because, defendant posits, the other potential jurors during voir dire also appeared disinterested when they were not being directly questioned. Satisfying defendant's request, however, would require this Court to overrule *Pona I*, a case in which we declined to consider a comparative juror analysis that was requested for the first time on appeal. *Pona I*, 926 A.2d at 609-10. We are not inclined to do so. Furthermore, the record before us does not permit such an analysis; other than a general comment about jurors looking disinterested when not being directly questioned, defendant did not offer any facts or observations to the trial justice to support his contention. Based on our well-settled raise-or-waive jurisprudence, we deem this argument waived. *Id.*

Finally, as to Juror 103, we similarly are persuaded that the state's reasoning for challenging Juror 103 supports the trial justice's finding that the stated reason was neither race-based nor pretextual. *See Pona II*, 66 A.3d at 473. This juror *sua sponte* requested a sidebar in order to discuss his concerns about potential retaliation at work regardless of the outcome of the trial.[7] These concerns qualify as a race-neutral reason for a peremptory challenge. We afford the

---

[7] We take a moment to note, however, that it would have been more appropriate for the trial justice, at this juncture, to have excused Juror 103 for cause. The juror clearly was concerned about retaliation at his place of employment, where during the ordinary course of business, he

- 11 -

trial justice great deference when evaluating the prosecution's state of mind, and we perceive no error in his conclusion. *Nichols*, 155 A.3d at 1191. We therefore affirm the trial justice's denial of defendant's *Batson* claims as to Juror 216 and Juror 103.

## II

### Cross-Examination of Matthew Roy

The defendant next argues that the second trial justice erred when she precluded cross-examination of Matthew Roy (Roy), a witness to the melee, about a gun that his roommate had prior to the homicide. Roy had been living with a man named John Santos (Santos) in an apartment located in the same building as the decedent. Roy testified, outside the presence of the jury, that two days before the murder, Santos showed him a firearm and said that it was a .380-caliber semiautomatic. On the night of the murder, Roy and Santos witnessed the fight from the balcony of their apartment; however, there is not a scintilla of evidence that Roy, Santos, or Santos's putative firearm were involved in the altercation.

The defense sought to cross-examine Roy about Santos's weapon in order to inject a new defense theory into the case: that Santos's firearm could have been used to murder Tiphany. The defense argued that Roy's testimony was "clearly relevant, especially in light of the fact that * * * the [murder weapon was] not found" and because "the jury is under the impression that no other weapon was in that house[.]" The defendant argued that the testimony could help establish that a weapon was fired from the apartment building where Santos was at the time of the murder.[8]

---

encounters patients from the Adult Correctional Institutions and the forensic unit. The trial justice concluded that the juror had made more than one reason for not wanting to serve. These concerns were a sufficient basis for excusing this juror.

[8] John Santos did not testify at trial.

- 12 -

The trial justice excluded the evidence on the basis of Rule 403 of the Rhode Island Rules of Evidence. She acknowledged that there was inconsistent evidence as to the precise location of the decedent when she was shot, but she found that there was no evidence whatsoever that the firearm that Santos had on May 7, 2011, was available two days later, on May 9, 2011. The trial justice stated:

> "There's no evidence whatsoever that [Santos] was involved in the altercation that ended up causing [decedent] her life. There's no evidence whatsoever that would suggest any motive on the part of Santos to fire his weapon on that day at anyone, whether it was [the decedent], the [d]efendant or any other person at the scene."

Although this reasoning, standing alone, was sufficient to exclude this evidence, the trial justice also considered the testimony of Neil Clapperton (Clapperton), an expert in firearm and toolmark identification, who testified to a reasonable degree of scientific certainty that the projectile could not have been discharged from a .380-caliber firearm, the type of weapon Santos allegedly told Roy he possessed. Clapperton further testified that the firearm used in the altercation was a .45-caliber. The trial justice concluded:

> "The fact that there's a total absence of evidence that [Santos] was involved in the altercation or that he fired the weapon on May 9th at her near the time [the decedent] was shot, and the expert testimony that if it was a .380 it just was not a firearm used to kill [the decedent], and I considered all of that. The inconsistent evidence as to her exact direction and location when she was shot was substantially outweighed by the evidence that suggested that the firearm seen by * * * Roy was not the firearm that shot her. And coupled with the testimony of the medical examiner as to how close the shooter was from [the decedent], there is no evidence that the shooter could have been on the balcony, which would have been where [Santos] would have been standing if at all.
>
> "So for all of these reasons, there's no relevant evidence that the firearm described by Roy was the firearm used to kill [the decedent]. And if there was any relevant evidence on this point, it is substantially outweighed by the danger of unfair prejudice, confusion of the issues and misleading of the jury."

- 13 -

On appeal before this Court, defendant asserts that the trial justice's decision violated his right to confrontation by failing to allow him to cross-examine Roy. We disagree.

It is well established that a defendant's entitlement to cross-examine the witnesses against him or her is an essential element of the due-process guarantees of the United States and Rhode Island Constitutions and the right of confrontation; however, the "scope of cross-examination is not unlimited and the questioning is subject to the sound discretion of the trial justice." *State v. Wright*, 817 A.2d 600, 610 (R.I. 2003); *see also State v. Manning*, 973 A.2d 524, 530 (R.I. 2009); *State v. Lomba*, 37 A.3d 615, 621 (R.I. 2012). "Inquiries that are potentially misleading or irrelevant, that offer little or no probative value, or that exceed the scope of the direct examination are objectionable[,]" and may be restricted by the trial justice. *Id.*; *see also State v. Brennan*, 526 A.2d 483, 488 (R.I. 1987). "A trial justice's exercise of discretion to limit the scope of cross-examination 'is not reviewable except for clear abuse, and only if it constitutes prejudicial error.'" *Lomba*, 37 A.3d at 621 (quoting *Wright*, 817 A.2d at 610).

After careful review of the record, we conclude that the trial justice appropriately precluded inquiry of Roy about a firearm that he saw two days before the homicide, which was offered to inject the possibility that there was a second gun and another shooter at the scene. It is within the trial justice's discretion to determine the relevance of the evidence before her and to balance any probative value of that evidence against the danger of confusing or misleading the jurors. *See State v. Warner*, 626 A.2d 205, 209 (R.I. 1993). In the case before us, defendant could not point to even a scintilla of evidence connecting this purported .380-caliber weapon that he saw on May 7, 2011, to the murder on May 9, 2011. We are satisfied that the trial justice properly performed the balancing test required by Rule 403, and are equally convinced that this evidence simply was not relevant to the issues at trial. We reiterate that an inquiry that is

determined to be irrelevant or misleading is appropriate grounds for exclusion. *See Lomba*, 37 A.3d at 621. Therefore, we affirm the trial justice's decision to deny defendant's request.

## III

## Motion to Pass

The defendant next contends that it was error for the second trial justice to deny defendant's motion to pass the case after an emotional outburst from a spectator during the defense's opening statement. In his opening statement, defense counsel stated:

> "Now, we know unfortunately that Tiphany Tallo died, and we know she was shot with a gun that was never recovered. That is the extent of what you will hear. The fact of the matter is that he did not kill Tiphany."

At that point, an unidentified spectator yelled out, "How's that?" and repeated the outburst while the jury was being escorted out of the courtroom. The trial justice immediately excused the jury and excluded the unidentified man from the courtroom for the remainder of the trial. Defense counsel thereafter moved for a mistrial, which was denied. In her ruling, the trial justice reasoned that:

> "There was nothing about [defense counsel's] opening statement that was unusual or should have evoked an emotional outburst. It was actually, the tone of [defense counsel's] opening statement was professional and really non-emotional. * * *

> "[T]he question becomes, was that one outburst, I think about four words before I immediately had the jury removed, prejudicial to the defendant to the extent that the defendant is now denied a fair trial? * * * [T]his single outburst, regrettable as it is, was not so prejudicial that the Court cannot cure it with an instruction and continue with the trial."

The trial justice then issued a curative instruction to the jury that has not been challenged on appeal. Before this Court, defendant asserts that the emotional outburst negatively impacted the

jury's first impression of the defendant and was prejudicial. It is defendant's contention that the trial justice abused her discretion by denying his motion to pass this case. We disagree.

"It is well settled that a decision to pass a case and declare a mistrial are matters left to the sound discretion of the trial justice." *State v. Dubois*, 36 A.3d 191, 197 (R.I. 2012) (quoting *State v. Barkmeyer*, 949 A.2d 984, 1007 (R.I. 2008)). This abuse-of-discretion standard obtains because "[t]he trial justice enjoys a ringside seat at the trial and therefore is in the best posture to determine whether a witness's inappropriate remark [or action] has so inflamed the jurors that they no longer would be able to decide the case based on a calm and dispassionate evaluation of the evidence." *State v. Hie*, 93 A.3d 963, 972 (R.I. 2014) (quoting *State v. Disla*, 874 A.2d 190, 198 (R.I. 2005)). Therefore, "[t]he ruling of the trial justice * * * is accorded great weight and will not be disturbed on appeal unless clearly wrong." *Dubois*, 36 A.3d at 197 (quoting *Barkmeyer*, 949 A.2d at 1007).

Immediately following the emotional outburst, which consisted of two remarks, the trial justice removed the jury from the courtroom; she admonished the spectators for the remainder of the trial and gave a curative instruction to the jury. The trial justice's response was prudent, swift, and definite. For these reasons, coupled with the fact that the emotional outburst was made during the opening statement on the first day of a seventeen-day trial, we are of the opinion that the trial justice did not clearly err in refusing to pass the case. We are not convinced that a member of the jury would even recall the remark or be influenced by a comment from a person who was excluded from the courtroom for the remainder of the trial. Thus, we affirm the trial justice's ruling.

# IV

## Motion for a New Trial

Lastly, defendant argues that the trial justice erred when she denied his motion for a new trial. The defendant challenges the verdict on the weight of the evidence, contending that the evidence of "stippling"[9] around the gunshot wound established that the shooter was several inches to a foot away from the decedent when the gun was fired and that there was no testimony that placed defendant in such close proximity to the decedent.[10] The defendant asserts that it is irrelevant that witnesses saw defendant with a gun, if there was no evidence that he also was placed close to the decedent.

"It is well settled that when reviewing a motion for a new trial, the trial justice must determine whether the evidence adduced at trial is sufficient for the jury to conclude guilt beyond a reasonable doubt." *State v. Phannavong*, 21 A.3d 321, 324 (R.I. 2011) (quoting *State v. Peoples*, 996 A.2d 660, 664 (R.I. 2010)). "The trial justice acts 'as a thirteenth juror, exercising independent judgment on the credibility of witnesses and on the weight of the evidence.'" *Id.* (quoting *State v. Heredia*, 10 A.3d 443, 446 (R.I. 2010)). "If, after conducting such a review, the trial justice reaches the same conclusion as the jury, the verdict should be affirmed and the motion for a new trial denied." *Id.* at 324-25 (quoting *Heredia*, 10 A.3d at

---

[9] "[G]un powder marks consist of peppered-like, dotted bruises and/or abrasions. These lesions [are] called * * * "*stippling*" [and] are produced by grains of burnt and unburnt powder striking the skin." 2 Cyril H. Wecht, Forensic Sciences § 25.04[a][iv] (Matthew Bender) (2017). (Emphasis added.)

[10] During the hearing on the motion for a new trial, defendant also challenged two other legal rulings: (1) the failure to pass the case after Breona Porter allegedly was intimidated on social media by Ashley Tallo, which convinced her not to testify; and (2) the court's exclusion of testimony concerning a police dispatch based on a second- or third-hand description of the shooter. However, before this Court, defendant concedes that these issues are not before the Court. The defendant therefore limits his appeal of the trial justice's denial of his motion for new trial to the weight of the forensic evidence.

446).  "As long as 'the trial justice has complied with this procedure and articulated adequate reasons for denying the motion, his or her decision will be given great weight and left undisturbed unless the trial justice overlooked or misconceived material evidence or otherwise was clearly wrong.'"  *Id.* at 325 (quoting *Peoples*, 996 A.2d at 664).

In addressing the sufficiency of the evidence, the trial justice declared that had she been presiding without the assistance of a jury, she would have reached an identical conclusion.  The trial justice acknowledged that the turbulent events that occurred on Spruce Street unfolded so quickly that it was unsurprising that there were "some inconsistencies concerning where people were standing or moving at various times[.]"  However, the trial justice was persuaded by eight credible eyewitnesses who consistently identified or accurately described defendant and placed him at the scene.[11]  Further, there was abundant testimony that defendant was the lone male in the melee and the only person who brandished a gun, then fled in a red vehicle.  Additionally, the trial justice found persuasive the testimony of Charles Catanese, M.D., the medical examiner who performed the autopsy on the decedent.  Doctor Catanese determined that the decedent was shot at close range and that the barrel of the gun was within several inches to a foot away from her.  The trial justice concluded that the evidence overwhelmingly favored a verdict of guilty for second-degree murder, and that the testimony of the eyewitnesses was consistent and credible, and supported the jury's finding that defendant fired the fatal shot.

Based on our careful review of the record, we are satisfied that the trial justice did not overlook or misconceive material evidence, and that she was not clearly wrong.  The eyewitness

---

[11]  At trial, Gian Benedetti, Heather Smith, Debryonna Fortes, Kaleena Monroe, Loretta Gonzalez, Theresa Palumbo, Christopher Smolenski, and Matthew Roy—all eyewitnesses to the incident—described defendant as a black male with braids wearing a white T-shirt and a hat. This was an accurate description of defendant's appearance on the night of the incident. Furthermore, Debryonna Fortes, Kaleena Monroe, Loretta Gonzalez, and Theresa Palumbo identified defendant shortly after the incident occurred.

testimony overwhelmingly established that the defendant was the only male involved in the incident and that it was the defendant who brandished a gun and fatally shot Tiphany Tallo, and then fled from the scene. Accordingly, we affirm the trial justice's decision denying the defendant's motion for a new trial.

## V

## Conclusion

We affirm the judgment of the Superior Court. We also remand the case with directions to enter a corrected judgment of conviction to reflect the sentence imposed by the trial justice. The record shall be returned to the Superior Court.

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Leron Porter. |
| **Case Number** | No. 2014-231-C.A. (P1/11-2541AG) |
| **Date Opinion Filed** | March 22, 2018 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Netti C. Vogel |
| **Attorney(s) on Appeal** | For State:<br><br>Jane M. McSoley<br>Department of Attorney General |
| | For Defendant:<br><br>Robert B. Mann, Esq. |