June 26, 2018

**Supreme Court**

No. 2017-158-C.A.
(P1/15-3593AG)

State                               :

    v.                              :

Bruce Moten.                        :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                        :

    v.                       :

Bruce Moten.                 :


Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.**  This case came before the Supreme Court on May 2, 2018, on appeal by the defendant, Bruce Moten (defendant), from a Superior Court judgment of conviction on eight counts and from the denial of the defendant's motion for a new trial.  The trial justice imposed two consecutive sentences of life imprisonment for murder and for discharging a firearm while committing a crime of violence, death resulting; two consecutive sentences of twenty years to serve for felony assault and discharging a firearm while committing a crime of violence; three consecutive sentences of ten years to serve for felony assault, discharging a firearm while committing a crime of violence, and conspiracy; and a suspended sentence of ten years, with probation, for carrying a pistol without a license.  The sentences imposed for the two counts of discharging a firearm while committing a crime of violence were ordered to be nonparolable.

Before this Court, defendant argues that the trial justice erred by allowing Providence Police Detective Theodore Michael to offer a lay opinion regarding the location of a particular cell phone at a certain point in time and by denying defendant's motion for a new trial.  For the reasons set forth herein, we affirm the judgment of the Superior Court.

**Facts and Travel**

The case on appeal arises out of a long-standing feud between two rival gangs that left one young man deceased and another man injured from gunshot wounds. The two Providence gangs, "Young Niggas in Charge" (YNIC) and its youth affiliate, the "Triple Y," and a gang known as the Chad Brown gang, or the "Triple C," had been embroiled in a grudge match that eventually erupted in 2014. Tensions began to rise during the summer of 2014 when Henry Lopez (Henry) and Tevin Briggs (Tevin),[1] members of YNIC, were at a local car wash and noted the presence of Triple C members Kendrick Johnson (Kendrick), Sean, and Tito in the vicinity. Upon observing the Triple C members, Tevin began to shoot at the rival gang, striking the car wash itself. The following day, at the same car wash, Henry was speaking to his fellow YNIC member, Antonio Fortes (Tone), who had driven up in a rented Buick with tinted windows. Triple C members Kendrick, Delacey Andrade (Delacey), and Terry Robinson (Terry) also were present at the car wash. After Tone departed in the Buick, Henry refused to disclose to Tito, a rival Triple C member, the identity of the persons inside Tone's Buick; the Triple C members took off in an unsuccessful pursuit of Tone.

Some months later, on the morning of October 22, 2014, the defendant, Bruce Moten, called his fellow YNIC member Henry and asked him for a ride to the Garrahy Judicial Complex so that he could pay some court fines. Henry picked up defendant and Tevin in his black Infiniti, and the three men drove around smoking marijuana for some time before arriving at the courthouse. Prior to entering the courthouse, defendant stashed his 9 mm handgun in Henry's glove compartment, and Tevin hid his .45-caliber handgun in the pouch on the back of Henry's seat. After defendant paid his fines, Henry, defendant, and Tevin went to the courthouse snack

---

[1] We refer to the individuals involved in this case by either their first names or nicknames in order to avoid confusion. We do not intend any disrespect by doing so.

bar, where they encountered Brian and Dizzle, two other YNIC members. Brian and Dizzle told Henry, defendant, and Tevin that they "got into a situation" when they were surrounded by members of Triple C on the fourth floor of the courthouse. Henry, defendant, and Tevin then left the courthouse and drove around for approximately one hour before receiving a phone call from Tone that Kendrick was "slipping"[2] at the PC Mart on the corner of Douglas Avenue and Eaton Street in Providence. The defendant suggested that Henry follow Kendrick, who was known to drive a Camry, and Henry headed to the PC Mart. When Henry, defendant, and Tevin arrived at the PC Mart in Henry's black Infiniti, they immediately saw Kendrick's black Camry and noticed that Kendrick, Terry, and Delacey were exiting the store. Henry began to tail the black Camry as it traveled down Douglas Avenue and onto Fillmore Street, at which point Kendrick's Camry pulled into the parking lot of the Chad Brown housing complex. As soon as Henry parked on the side of the road, defendant and Tevin pulled up their hoods, had their guns in the waistbands of their sweatpants, and exited the vehicle, leaving Henry at the wheel. After hearing multiple gunshots, Henry drove to the intersection of Fillmore and Oregon Streets, and defendant and Tevin ran to the Infiniti with their guns in their hands. Henry sped off to the home of one of his girlfriends, Yahaira Montanez (Yadi).[3]

A bystander, Charlene Rainey, heard the gunshots as she drove away from a nearby Dunkin' Donuts; she reported the shooting to the Providence police at approximately 11:30 a.m. Rainey also saw two young men run by her car, both wearing black hoodies. The police and emergency medical personnel arrived at the crime scene to find Terry gunned down and

---

[2] According to Henry's testimony, "slipping" is a term used to indicate that someone has let his or her guard down.

[3] Henry was also dating Marilyn Ramos at the same time and had given her a ride to the courthouse earlier on the morning of October 22, 2014, where he saw Kendrick's Camry at the courthouse before switching cars and picking up defendant and Tevin.

deceased[4] and Delacey injured from a gunshot wound to the buttocks.[5]   Providence BCI detectives recovered 9 mm and .45-caliber cartridge casings and a .45-caliber intact bullet. Approximately sixty to ninety minutes after the shooting, the police broadcast a description of the car involved in the shooting—a black Infiniti with tinted windows.

Meanwhile, at Yadi's house, located at 49 Tappan Street in Providence, Henry and Tevin asked Yadi to drive the black Infiniti to Courtney Rivers's (Courtney) home located at 67 Alaska Street in Providence.[6]   As instructed, Yadi and her friend Jennifer Martinez (Jennifer) drove Henry's Infiniti to Courtney's house, and Courtney and Henry's brother, Juan, drove Yadi and Jennifer back to Tappan Street.  When Yadi returned to her home, she found Henry, defendant, and Tevin sitting at her kitchen table with their guns on the table, discussing what had just transpired.  The defendant went into Yadi's bathroom to wash his hands and asked Yadi for a garbage bag.  Yadi testified that she saw a gun near the sink and that defendant told her, "It was either us or them[,]" and he displayed scars on his stomach.  Before leaving Yadi's house, Henry hid the guns belonging to defendant and Tevin in Yadi's bedroom.

Later that evening, at the apartment building in which both Henry and Tone lived, on Cherry Street in Pawtucket, Henry disclosed to Yadi and Jennifer the events surrounding the shooting earlier in the day.  Henry then joined Tone, Tevin, defendant, Courtney, and Juan inside Tone's apartment.  While inside Tone's apartment, Courtney received a phone call from his

---

[4] The autopsy revealed that Terry had died of a gunshot wound to the head, causing an "irreversible devastating head injury," which in turn led to immediate unconsciousness and death.

[5] Delacey did not require surgery for his injury; however, the bullet causing the injury damaged the nerve that controlled his lower leg and foot.  He was hospitalized for pain management and underwent physical therapy.

[6] Courtney Rivers is a friend of Henry Lopez and does not have any gang affiliation.

landlord that the police had arrived at Courtney's house and were towing the black Infiniti. Henry immediately asked Juan to call their cousin Danny Gomez (Danny), the putative owner of the Infiniti, and direct him to retrieve the vehicle from the Providence police station.[7] Although he initially maintained that he was the owner of the black Infiniti, Danny eventually revealed to the Providence police that the car actually belonged to Henry.

Approximately three weeks after the October 22, 2014 shooting, Henry fled to Puerto Rico. He returned to Providence for a short period of time before Christmas 2014; but, when he was informed that Yadi's friend Jennifer had appeared before the grand jury, he again departed. Henry was eventually apprehended in the Dominican Republic and extradited to Providence.

On April 10, 2015, defendant was indicted in Providence County Superior Court and charged with nine felony counts: Count 1—murder, in violation of G.L. 1956 §§ 11-23-1 and 11-23-2; Count 2—discharging a firearm while committing a crime of violence, death resulting, in violation of § 11-47-3.2(b)(3); Count 3—assault with a dangerous weapon, in violation of § 11-5-2 and G.L. 1956 § 12-19-39; Count 4—discharging a firearm while committing a crime of violence, injury resulting, in violation of § 11-47-3.2(b)(2); Count 5—assault with a dangerous weapon, in violation of §§ 11-5-2 and 12-19-39; Count 6—discharging a firearm while committing a crime of violence, in violation of § 11-47-3.2(b)(1); Count 7—conspiracy, in violation of § 11-1-6; Count 8—carrying a pistol without a license, in violation of § 11-47-8(a); and Count 9—carrying a pistol without a license, in violation of § 11-47-8(a). On the same day, Tevin, Henry, and Tone also were indicted on the same nine counts. While Henry was being held at the Adult Correctional Institutions, defendant urged him to take the case to trial. Instead,

---

[7] Although Henry owned the black Infiniti and paid the car insurance for the vehicle, the vehicle was registered in his cousin Danny Gomez's name in order to prevent the car from being seized by law enforcement if the police caught Henry for selling drugs and to avoid paying the taxes that he owed on the vehicle.

Henry entered into a cooperation agreement with the state, in which he agreed to plead guilty to second-degree murder, discharging a firearm while committing a crime of violence, and other related charges, in exchange for a fifty-year sentencing cap. Tevin also entered a guilty plea on several charges in exchange for the dismissal of the remaining counts. On November 5, 2015, superseding indictments were filed against defendant and Tone, charging them with the same nine original counts. The defendant and Tone were tried together before a jury in Superior Court beginning on October 4, 2016, and the trial spanned ten trial days.

Yadi testified at trial with respect to the events that occurred on October 22, 2014, the day of the shooting. She testified that she did not realize what had happened that morning when Henry, Tevin, and defendant were at her home until she watched the news that afternoon and saw Henry's black Infiniti on television described as being connected to a homicide in the Chad Brown housing complex. She testified that she told Henry she did not want the guns in her home and that he told her "[n]ot to worry about it." She also testified that, later in the evening, while she and Henry were at Henry's uncle's house, Henry told her that Tevin and defendant "both had guns. They went out the car with guns[,]" and that "they shot somebody." Despite feeling "used" by Henry, Yadi continued to see him over the next year. In fact, she reunited with Henry during his second flight attempt in Puerto Rico. Yadi also testified that around the same time, during the winter of 2015, she and defendant began to exchange messages on Facebook; and, in January 2015, defendant took Yadi out to dinner. Yadi testified that, on one occasion, defendant bought her an outfit from Victoria's Secret and that, when he gave her the outfit, he said, "Snitches get stitches."

Henry also testified at trial with respect to the fatal shooting. He testified that defendant and Tevin both exited his black Infiniti with their guns in their waistbands. He also stated that

defendant and Tevin both ran back to the Infiniti with their guns in their hands after gunshots had been fired. Once defendant and Tevin were back in the Infiniti, according to Henry, defendant stated that Tevin was "crazy" "[b]ecause he ran up to the car. He ran up to the car shooting." He further testified that Tevin recounted the details of the shooting once the three men were inside Yadi's house:

> "Tevin was telling me that he chased down—he chased down Terry Robinson and—but first he said he was shooting at the car, and his gun jammed, and said that—that Terry Robinson peeked his head out between these cars while his gun jammed. And then I guess when Terry Robinson seen him with the gun jammed, he took off running and then Tevin unjammed the gun and started chasing him, shooting at him."

Henry also admitted that he fled to Puerto Rico because he "thought [the police were] going to come looking for [him]."

Henry's testimony was corroborated by a wealth of technical evidence at trial, introduced by the state. Surveillance footage depicted Henry, Tevin, and defendant parking and entering the Garrahy Complex. Another surveillance video showed Kendrick's black Camry at PC Mart. A video compilation from the Chad Brown area depicted the black Infiniti driving around the vicinity of the crime scene, two men walking towards Fillmore Street and then running back towards the Infiniti, and the Infiniti speeding down Fillmore Street.

Henry's credibility was also enhanced by corroborating cell-site data and cell phone records. The state introduced Agent Jennifer Banks, of the Federal Bureau of Investigation (FBI) Cellular Analysis Survey Team (CAST), as an expert witness in historical cell-site analysis. Agent Banks testified that she was provided with three sets of cell phone records from three different phone companies, and that she then obtained the cell tower listing from those providers for the hours between 9 a.m. and noon on October 22, 2014; and, based on this data, she created

maps that showed the location of those cell sites used during that particular time frame. The various maps that Agent Banks composed as part of her analysis were introduced into evidence and were presented in conjunction with her testimony at trial. Agent Banks testified that, based on her analysis and collected data, the cell phones belonging to Henry, defendant, and Tevin were all located in the downtown Providence area between 9 and 10 a.m., and then, at approximately 10:58 a.m., all three phones indicated movement slightly north to an area east of Providence College. She also testified that defendant's phone moved towards Douglas Avenue at 11:04 a.m.:

> "This phone, as you recall, in the 10:00 to 11:00 hour had moved north up east of Providence College, and then at 11:00 a.m. you see another registration here up east of Providence College, then moves at 11:04 to a tower covering here, near the, you know, near Route 7, which I believe is Douglas Street here and Admiral Street, that general area, and then moves southeast to this 11:08 registration here, which covers this western side of the tower. And then by 11:31, that phone is using the northeast sector of this tower, and then moves back to the 30-degree sector here by 11:38."

In addition to collecting data, Agent Banks also conducted a field survey to validate her conclusions, in which she drove through all of the streets in the Providence College to downtown Providence area in order "to collect what radio frequencies were in that area and which were the most dominant towers of coverage." Based on her research and analysis, Agent Banks concluded that defendant's phone was in or near the area of the shooting at the time in question:

> "[PROSECUTOR:] So based on your analysis, would it be consistent to say that this phone was in or near the area of 100 Fillmore Street at this time?
>
> "[BANKS:] Yes. The Fillmore Street address is right on the boundary of where there's dominant and possible coverage.
>
> "* * *

"[PROSECUTOR:]    And based on these two maps you were able to create through this drive-test analysis, what was the general location of Bruce Moten's phone during the time period of 11:38 and 12:00 p.m.?

"[BANKS:] The [defendant's] phone is using this tower, which provides coverage northeast of Providence College to extend to these dominant areas.

"* * *

"[PROSECUTOR:] And would the phone be consistent with being in or near the area of 49 Tappan Street on the map?

"[BANKS:] Yeah. That's one area that this tower provides dominant coverage to.

"[PROSECUTOR:] And, again, that would be the AT&T phone, where the phone I referred to as Bruce Moten's phone?

"[BANKS:] Yes."

The defendant did not object to any portion of Agent Banks's testimony.[8]

Detective Theodore Michael, a forensic cell phone examiner with the Providence Police Department, also testified as an expert in forensic cell phone analysis. The defendant objected to Det. Michael offering an expert opinion in the field of historical cell-site analysis, to which the state responded that the testimony on historical cell-site analysis was being offered by Agent Banks and that Det. Michael would only testify about the data he physically extracted from the various cell phones. The trial justice overruled defendant's objection and offered a voir dire: "I'm satisfied that the witness has sufficient qualifications to testify in the mode that the State is going to pursue. The objection is overruled. Do you wish to have any voir dire?"  The

---

[8] We also note that no Fourth Amendment objection was raised by defendant regarding the extraction of historical cell-site data, such that the recent United States Supreme Court opinion in *Carpenter v. United States*, No. 16-402, 2018 WL 3073916 (June 22, 2018), has no application to the case at bar.

defendant declined to question the witness as to his qualifications and offered no objection to any portion of Det. Michael's trial testimony.

Detective Michael first testified with respect to the call detail records (CDR) of the actors alleged to be involved in the shooting, which he obtained from their various cell phone carriers. He testified generally as to how the cell tower's identifying information can be used along with a list of the provider's local cell tower locations to determine where the cell tower associated with a given call is located. Detective Michael testified that he had extracted the contents of defendant's phone using specialized software, which he then compiled into a report. At the outset, Det. Michael testified that there had been a "heavy deletion" of over 3,000 items from defendant's phone. Detective Michael retrieved a photograph of Kendrick, Delacey, and Terry from defendant's phone that had been downloaded from Facebook and later deleted. He also testified about certain text messages he retrieved that were between the cell phones belonging to defendant and Tone.

The defense proffered the theory that it was actually Courtney, and not defendant, who participated in the shooting. Detective Michael testified with respect to the location of Courtney's cell phone at the time of the murder by using historical cell-site information contained in Courtney's call log. Based on his analysis, Det. Michael determined that Courtney was not near 100 Fillmore Street during the time of the shooting. The following colloquy ensued:

> "[PROSECUTOR:] And going back to Courtney Rivers. Did you have the opportunity to examine those records for the date of the homicide, October 22, 2014?
>
> "[DET. MICHAEL:] I did.
>
> "[PROSECUTOR:] And were you able to examine those records for the time of the homicide at approximately 11:32 a.m.?

"[DET. MICHAEL:]  I did.

"[PROSECUTOR:]  And did the call detail records that you had for that Courtney Rivers's phone number include the cell site information that's been discussed in testimony today?

"[DET. MICHAEL:]  Yes.

"[PROSECUTOR:]  So based on [those] records and the information contained therein, were you able to make any determination about Courtney River[s]'s location at 11:32 a.m. on the day of the homicide?

"[DET. MICHAEL:]  Yes.  When I had looked at Courtney River[s]'s 11:32 a.m. phone call for the tower that I was hitting, I observed that it was hitting the School Street in Pawtucket tower.

"[PROSECUTOR:]  And then did you also look at some communication on Courtney River[s]'s cell phone at 11:37 a.m.?

"[DET. MICHAEL:]  I did.

"[PROSECUTOR:]  Do you remember what you were able to determine from the communication on his phone at that time?

"[DET. MICHAEL:]  Yes.  That call actually moved from 11:32 to 11:37, and that was on the Branch and Woodward Road, over near the McDonald's, on the Branch Avenue location.

"[PROSECUTOR:]  And are you familiar with Courtney River[s]'s home address?

"[DET. MICHAEL:]  I don't know the number, but I know the street.

"[PROSECUTOR:]  What street did he live on at this time?

"[DET. MICHAEL:]  Alaska—Alaska Street or Alaska  Avenue.

"[PROSECUTOR:]  And is that near at all the Woodward Avenue location that you just testified to?

"[DET. MICHAEL:]  It is.

"[PROSECUTOR:]  How close would that be?

"[DET. MICHAEL:] Within a quarter of a mile."

On cross-examination, defendant attempted to rebut Det. Michael's testimony that Courtney was not near the crime scene at the time of the shooting:

> "[DEFENSE COUNSEL:] [Courtney] was a pretty obvious early suspect in the case, right?
>
> "[DET. MICHAEL:] Along with others, yes.
>
> "[DEFENSE COUNSEL:] Because the car was found at his home, right?
>
> "[DET. MICHAEL:] Yes.
>
> "[DEFENSE COUNSEL:] And one of the reasons he was excluded as a suspect is because you found an 11:32 a.m. telephone call that put him out of the area, right?
>
> "[DET. MICHAEL:] That along with other things, yes.
>
> "[DEFENSE COUNSEL:] And you were assuming that he was the one who placed that telephone call, right?
>
> "[DET. MICHAEL:] I was.
>
> "[DEFENSE COUNSEL:] You realized that someone else could have had his phone, though, right?
>
> "[DET. MICHAEL:] Absolutely."

The trial proceeded.

At the close of the state's case, the trial justice granted defendant's motion for a judgment of acquittal on Count 9, carrying a pistol without a license. On October 18, 2016, the jury found defendant guilty of the remaining counts pending against him. The defendant moved for a new trial on the basis that Henry was the only witness who was able to place defendant at the crime scene and that the state had failed to produce any other competent evidence to show that defendant was one of the shooters. The trial justice denied defendant's motion for a new trial

and sentenced him to consecutive life sentences on Counts 1 and 2; consecutive terms of twenty years to serve on Counts 3 and 4; consecutive terms of ten years to serve on Counts 5, 6, and 7; and a ten year suspended sentence, with probation, on Count 8. The sentences on Counts 4 and 6—the two firearms offenses—were ordered to be ineligible for parole. The defendant timely appealed.

**Standard of Review**

"A trial justice's ruling on the admissibility of an expert witness's proffered testimony 'will be sustained provided the discretion has been soundly and judicially exercised, that is, if it has been exercised in the light of reason applied to all the facts and with a view to the rights of all the parties to the action * * * and not arbitrarily or willfully, but with just regard to what is right and equitable under the circumstances and the law." *Owens v. Silvia*, 838 A.2d 881, 890 (R.I. 2003) (quoting *Morra v. Harrop*, 791 A.2d 472, 476-77 (R.I. 2002)). Moreover, "[t]he purpose of expert testimony is to aid in the search for the truth. It need not be conclusive and has no special status in the evidentiary framework of a trial." *Id.* at 890 (quoting *Morra*, 791 A.2d at 477).

Further, "[w]hen ruling on a motion for a new trial, the trial justice acts as a thirteenth juror, exercising 'independent judgment on the credibility of witnesses and on the weight of the evidence.'" *State v. Heredia*, 10 A.3d 443, 446 (R.I. 2010) (quoting *State v. Imbruglia*, 913 A.2d 1022, 1028 (R.I. 2007)). "If, after conducting such a review, the trial justice reaches the same conclusion as the jury, the verdict should be affirmed and the motion for a new trial denied." *State v. Porter*, 179 A.3d 1218, 1231 (R.I. 2018) (quoting *State v. Phannavong*, 21 A.3d 321, 324 (R.I. 2011)). The trial justice need set forth only a few sentences summarizing his reasoning. *State v. Lopez*, 129 A.3d 77 (R.I. 2016). "As long as the trial justice has complied

- 13 -

with this procedure and articulated adequate reasons for denying the motion, his or her decision will be given great weight and left undisturbed unless the trial justice overlooked or misconceived material evidence or otherwise was clearly wrong." *Porter*, 179 A.3d at 1231 (quoting *Phannavong*, 21 A.3d at 325).

**Analysis**

On appeal, defendant argues that Det. Michael's testimony that Courtney's phone was not at the Fillmore Street parking lot in Providence at the time of the shooting severely undercut defendant's contention that it was Courtney, and not defendant, who had been one of the shooters. The defendant further contends that Det. Michael was neither qualified as an expert in historical cell-site analysis nor did he possess the knowledge and training to render a technically sound opinion. However, after a thorough examination of the record, we deem defendant's arguments with respect to Det. Michael's testimony to be waived.

This Court has long adhered to the raise-or-waive rule. *See State v. Pona*, 66 A.3d 454, 468 (R.I. 2013). It is this Court's policy that, "if an issue was not preserved by *specific objection* at trial, then it may not be considered on appeal." *Id.* (second emphasis added) (quoting *State v. McManus*, 990 A.2d 1229, 1237 (R.I. 2010)). This Court "require[s] a specific objection so that the allegation of error can be brought to the attention of the trial justice, who will then have an opportunity to rule on it." *Id.*

The defendant failed to raise any objection, whatsoever, to any portion of Det. Michael's testimony. On appeal, defendant takes issue with the portion of Det. Michael's testimony that places Courtney in Pawtucket at the date and time of the shooting:

> "[PROSECUTOR:] So based on [those] records and the information contained therein, were you able to make any determination about Courtney River[s]'s location at 11:32 a.m. on the day of the homicide?

"[DET. MICHAEL:] Yes. When I had looked at Courtney River[s]'s 11:32 a.m. phone call for the tower that I was hitting, I observed that it was hitting the School Street in Pawtucket tower."

However, defendant may not object to Det. Michael's testimony at the appellate level when he failed to do so in Superior Court. *See State v. Bido*, 941 A.2d 822, 828-29 (R.I. 2008) ("It is well settled that a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court.").

Clearly, there is nothing in the record before us to suggest that defendant wanted to exclude Det. Michael's testimony at trial. The state suggests that defendant did not object at trial because the context of Det. Michael's testimony was clear and it was understood that he was simply testifying with respect to the locations of the various cell phones, *not* the locations of the various actors. Further, defense counsel undercut Det. Michael's testimony on cross-examination when she implied that it was possible that Courtney could be at one location and his cell phone could be at a different location:

"[DEFENSE COUNSEL:] And you were assuming that he was the one who placed that telephone call, right?

"[DET. MICHAEL:] I was.

"[DEFENSE COUNSEL:] You realized that someone else could have had his phone, though, right?

"[DET. MICHAEL:] Absolutely."

Although there is nothing to suggest that this cross-examination was not part of defendant's trial strategy, whether defendant intentionally failed to object to Det. Michael's testimony is of no moment to this appeal, because the absence of an objection renders the issue not properly before us. The defendant is not entitled to a "do over" simply because he is not satisfied with how his

trial strategy panned out. Accordingly, we deem this issue waived and need not reach the merits of defendant's claim.

The second issue defendant raises on appeal is his assertion that the trial justice erred in denying his motion for a new trial based on the weight of the evidence. The defendant contends that he was entitled to a new trial because the only evidence incriminating him as a principal shooter came from Henry, who, he alleges, had a motive to lie based upon his plea agreement. It is well settled that, when deciding a motion for a new trial based upon the weight of the evidence:

> "The trial justice must consider, in the exercise of his [or her] independent judgment, all the material evidence in the case, in the light of his [or her] charge to the jury and pass on its weight and the credibility of the witnesses, determine what evidence is believable, and, decide whether the verdict rendered by the jury responds to the evidence presented and does justice between the parties." *McGarry v. Pielech*, 47 A.3d 271, 280 (R.I. 2012) (quoting *Morgera v. Hanover Insurance Co.*, 655 A.2d 698, 698 (R.I. 1995) (mem.)).

Here, the trial justice summarized in great detail what he described as the credible evidence presented in this case. He found Henry's testimony credible:

> "[S]uffice it to say, that from my vantage point, as a front-row observer, Henry Lopez's testimony was persuasive, reliable, and weighty to convict Bruce Moten of the charges in this indictment.
>
> "I am, of course, fully cognizant that Lopez underwent severe cross-examination during the course of the trial, and his cooperation agreement with the State was fully explored along with his criminal record. Nonetheless, his testimony was, in my view, very credible, ensnaring Bruce Moten as a co-conspirator as well as a principal in these shootings."

The trial justice also noted the presence of corroborating evidence in the record:

> "I need not catalogue or neatly list here all of the other evidence, including the wealth of cell phone history, as well as the video

recordings of the Infiniti and black Camry, which were offered in evidence to corroborate Henry Lopez's testimony."

In the case at bar, the trial justice carefully performed his duty as a thirteenth juror, considering all of the material evidence in the record and independently weighing that evidence. The trial justice passed upon the credibility of the testimony by Henry and Yadi and found both witnesses to be quite credible, a finding to which this Court accords great deference. *See State v. Giard*, 155 A.3d 1193, 1200 (R.I. 2017) ("It is noteworthy that we 'accord [ ] deference to the credibility determinations of the hearing justice,' * * * because '[w]e do not have the same vantage point as [him or her], and we are unable to assess the witness' demeanor, tone of voice, and body language.'") (quoting *State v. Jensen*, 40 A.3d 771, 778 (R.I. 2012); *State v. Woods*, 936 A.2d 195, 198 (R.I. 2007)). He also determined that the verdict rendered by the jury responded to the evidence presented and stated:

> "These jurors took their responsibilities most seriously, and their split verdict, acquitting Antonio Fortes [Tone] while convicting Bruce Moten, demonstrates their careful parsing of the evidence and their assiduous adherence to the [c]ourt's instructions to weigh the evidence and give each defendant separate attention.
>
> "* * *
>
> "The verdict convicting Bruce Moten was absolutely a correct one, and the motion for new trial is denied."

The defendant does not advance any other reason or argument why his motion for a new trial should have been granted. Discerning no error on the part of the trial justice in this case, we conclude that the trial justice properly denied the defendant's motion for a new trial.

### Conclusion

For the reasons set forth herein, we affirm the judgment of the Superior Court. The papers may be returned to that tribunal.

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Bruce Moten. |
| **Case Number** | No. 2017-158-C.A.<br>(P1/15-3593AG) |
| **Date Opinion Filed** | June 26, 2018 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State:<br><br>Lauren S. Zurier<br>Department of Attorney General<br>For Defendant:<br><br>Angela M. Yingling<br>Office of the Public Defender |