# United States Court of Appeals
## For the First Circuit

No. 21-1333

LERON PORTER,

Petitioner, Appellant,

v.

PATRICIA ANNE COYNE-FAGUE, Director of the Rhode Island
Department of Corrections,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

Before

Barron, Chief Judge,
Selya and Howard, Circuit Judges.

Robert B. Mann, with whom Robert B. Mann Law Office was on
brief, for appellant.
Christopher R. Bush, Assistant Attorney General, with whom
Peter F. Neronha, Attorney General, was on brief, for appellee.

May 31, 2022

**SELYA**, **Circuit Judge**.  No right is more fundamental to our criminal justice system than the right of a defendant to a fair trial.  Over time, the Supreme Court has woven a tapestry of rules designed to protect that right.  An important strand in the weave of that tapestry is laid out in Batson v. Kentucky, 476 U.S. 79 (1986), under which a defendant may challenge a prosecutor's peremptory strike of a prospective juror as racially discriminatory.

In this habeas case, petitioner-appellant Leron Porter, a Rhode Island state prisoner who is an African-American man convicted of murder and other crimes, claims that the prosecutor transgressed the Batson rule in the course of jury selection.  The state supreme court disagreed, see State v. Porter (Porter I), 179 A.3d 1218, 1226-27 (R.I. 2018), and the petitioner sought federal habeas relief.  The United States District Court for the District of Rhode Island held that the prosecutor had crossed the Batson line but that, under the rigorous standards applicable to habeas review, the decision of the state supreme court should not be disturbed.  See Porter v. Coyne-Fague (Porter II), 528 F. Supp. 3d 2, 9-10 (D.R.I. 2021).  The petitioner appeals.

This is the rare case in which the prosecutor's explanation for his peremptory strike was not race-neutral on its face and, thus, violated Batson.  We hold that the decision of the state supreme court, however viewed, cannot withstand habeas

- 2 -

review: that decision rests on either an unreasonable application of clearly established federal law, an unreasonable determination of the facts, or both. Consequently, we reverse the decision of the district court and remand with directions that the district court grant the habeas writ, ordering the state courts to vacate the petitioner's convictions and, unless he is tried anew within ninety days of the district court's order, to release him.

## I

We briefly rehearse the relevant facts and travel of the case. We confine our factual recitation and analysis to the sole issue raised in the petitioner's application for habeas relief: whether the prosecution's strike of the only black prospective juror violated Batson. In the process, we draw upon the facts recited by the Rhode Island Supreme Court, supplemented by other facts in the record consistent with that recitation. See Companonio v. O'Brien, 672 F.3d 101, 104 (1st Cir. 2012).

Tiphany Tallo, a seventeen-year-old girl, was shot and killed during a violent brawl in a churchyard in Providence, Rhode Island on May 9, 2011. See Porter I, 179 A.3d at 1222. Jealousy between two women (Tiphany's sister and the petitioner's sister) over a man lay at the root of the strife. See id. As the melee intensified, witnesses say that they saw the petitioner fire a gun in Tiphany's direction, after which she "placed her hand on her chest . . . and collapsed." Id. Tiphany was pronounced dead at

a local hospital soon afterward and the petitioner (who had fled the scene) was apprehended. See id. at 1222-23. The authorities charged him with murder, various firearms offenses, and assault with a dangerous weapon. See id. at 1223.

In preparation for trial in Providence County Superior Court, jury selection took place in November of 2013. Juror 103 was an African-American male and, as counsel for both sides confirmed, was the only black person in the venire. Unprompted, Juror 103 requested to speak with the trial justice immediately upon being called by the clerk. See id. at 1225. In a sidebar conference, he stated that he was an institutional attendant at Eleanor Slater Hospital (a state institution) and that there was "considerable chatter about this case" at work. He explained that some patients at the hospital were inmates at a local correctional facility who "follow these cases" and were likely to discover his service on the jury. Id. Given the chatter about the case, he told the court, "chances are, regardless which way [the verdict] goes, I can find myself subject of either allegations or hostile treatment either from the staff or from patients." Id. at 1226 (alteration in original).

Pressed by the trial justice, Juror 103 affirmed that he was "not at all" biased or prejudiced in resolving the matter, but agreed with the trial justice that he had "concern" that he might face "blow-back at the facility regardless of what decision this

- 4 -

jury makes."  In response to additional questioning by the prosecutor, Juror 103 stated that his fear of workplace retaliation "would not affect [his] decision" or "affect [him] being fair" as a juror, "but it possibly could affect [his] life thereafter." Asked by the prosecutor whether he had "a concern that if [he] were to ultimately . . . vote guilty, and the jury came back guilty, . . . that [he] possibly could face retaliation because of that verdict," Juror 103 replied, "[a]bsolutely."  He nonetheless concluded the sidebar discussion by reaffirming to the trial justice that he would be "a fair and impartial juror."

After a recess, the prosecutor exercised a peremptory strike as to Juror 103.  Without being asked to justify the strike, the prosecutor volunteered the following explanation, which we recount at length because of its centrality to this appeal:

> The State submits that . . . [Juror 103] immediately asked for a sidebar discussion. During that ensuing discussion . . . the State focused on, and ultimately has concern with, and bases its challenge on articulating a race-based [sic] neutral reason for its challenge under Batson as to the following. Although the . . . juror did say he could be, quote, fair . . . the State bases its challenge on the following.  The juror ultimately indicated that he has a feeling and is under the belief that as a consequence of his verdict, he may face repercussions, or he would face — and I think the words he used, Your Honor, was he would get blow-back, quote-unquote.  Blow-back and concern, based on his verdict.
>
> Essentially, what he was saying is that — and, again, this is the State's take —

- 5 -

he's a member of the African-American community, the defendant at the bar is a member of the African-American community, he's the only one on the panel who is, and if he were to vote guilty there could be consequences to it. And I would submit, respectfully, I may be wrong, but if he were to vote not guilty, I don't think he would have any consequence. I don't think he indicated — and I think, I would infer from the record that all of his concern is, quote, towards a guilty verdict. He never was asked that, but I would — as common sense indicates, how could it not [sic] be for a not guilty verdict?

Essentially, although he may have said he could deliver a verdict in this case, he expressed, as stated on the record, if the defendant was found guilty, . . . a person at the [correctional facility] that got word of that could cause him concern, and I think he actually used the words: They would find out, and it could affect me.

I think, based on that, the State submits that we have a reason that although he said he could deliver a verdict, quite frankly, I still think it's a concern for him, and based on that, we would ask to excuse the juror.

Defense counsel objected on <u>Batson</u> grounds, arguing that Juror 103 was being struck because he was "the only African[-American] on the panel" and "because the defendant is an African-American."

The trial justice then stated that his "job at this point is to determine whether or not the State's explanation is a race-neutral explanation" and whether that explanation "is a credible explanation." The trial justice remarked that "if [he] were a lawyer in [the prosecutors'] seat, [he] would not want this juror on [his] trial either, and it would not be for race reasons at

all."  Rather, the trial justice reasoned, "[t]his is not a man [he] would want on [his] jury" because Juror 103 "harbor[ed] grave concerns as to what he will be exposed to in his workplace" due to his verdict and that is "a race-neutral explanation."  The trial justice proceeded to excuse Juror 103 from the panel.  A jury bereft of any African-American members was subsequently seated. And — after more than seventeen days of trial — the jury found the petitioner guilty of second-degree murder and two firearms offenses.  See Porter I, 179 A.3d at 1223.  He was sentenced to two separate terms of life imprisonment for murder and for discharging a firearm while committing a crime of violence.  See id. at 1221.  He was also sentenced to shorter terms for possession of a firearm and for being a habitual offender.  See id.

The petitioner appealed to the Rhode Island Supreme Court, arguing (among other things) that the prosecutor "failed to offer a valid race-neutral reason for challenging" Juror 103.  Id. at 1226.  Without addressing the prosecutor's explicit invocation of race, the state supreme court found that the "prosecutor reasoned that a strike was necessary based on Juror 103's concerns . . . about potential retaliation" and had "little difficulty concluding that the state's reasoning for challenging [Juror 103] qualifies as race-neutral and nonpretextual."  Id. The court explained that Juror 103's "concerns about potential retaliation at work regardless of the outcome of the

- 7 -

trial . . . qualify as a race-neutral reason for a peremptory challenge."  Id. at 1227.[1]

On September 30, 2019 — after the United States Supreme Court denied his petition for certiorari, see Porter v. Rhode Island, 139 S. Ct. 376 (2018) — the petitioner filed this timely federal habeas petition, naming as respondent the Director of the Rhode Island Department of Corrections.  The sole ground was that the prosecutor's supposedly race-neutral explanation for striking the African-American juror violated Batson and its progeny.

After briefing and oral argument, the district court concluded that "the State's proffered reason for striking Juror 103 [was] race based" and, therefore, the petitioner's "rights under Batson appear to have been violated."  Porter II, 528 F. Supp. 3d at 9.  Even so, the court acknowledged that the Rhode Island Supreme Court "assessed the proceedings differently, and found sufficient race-neutral reasons for a peremptory challenge against Juror 103."  Id.  Determining that this decision was not "beyond the realm of fair-minded judicial reasoning," the court concluded that it had no choice but to deny the petition under the highly deferential standards of federal habeas review.  Id. at 8-10.  Relatedly, the court denied as moot the respondent's motion

---

[1] As an aside, the court perspicaciously observed "that it would have been more appropriate for the trial justice . . . to have excused Juror 103 for cause."  Porter I, 179 A.3d at 1227 n.7.

to dismiss.  See id. at 10 n.5.  The court subsequently issued a certificate of appealability, see 28 U.S.C. § 2253(c), describing the Batson issue as "extremely difficult and close."

This timely appeal followed.

## II

Where, as here, "the district court undertakes no independent factfinding [and] we are effectively in the same position as the district court vis-à-vis the state court record," our review of a district court's denial of a habeas petition is de novo.  Pike v. Guarino, 492 F.3d 61, 68 (1st Cir. 2007).

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (codified as amended at 28 U.S.C. § 2254), demands that a federal habeas court measure a state court's decision on the merits against a series of "peculiarly deferential standards."  Cronin v. Comm'r of Prob., 783 F.3d 47, 50 (1st Cir. 2015).  Under that statutory scheme, a prisoner seeking federal habeas relief with respect to a claim "adjudicated on the merits in State court" must show that the state court's decision either "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

- 9 -

The first of those showings, codified in section 2254(d)(1), splits into two distinct avenues for relief: the "contrary to" clause and the "unreasonable application" clause. The "contrary to" clause applies when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). The "unreasonable application" clause applies when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. Section 2254(d)(1)'s phrase "clearly established federal law, as determined by the Supreme Court," means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Id. at 412. State courts must "reasonably apply" existing Supreme Court precedent, but they need not "extend that precedent." White v. Woodall, 572 U.S. 415, 426-27 (2014) (emphasis in original).

The upshot of the AEDPA habeas regime is that "when the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion" — and here, the Rhode Island Supreme Court has done just that — "a federal habeas court simply reviews the specific reasons given by the state court and

- 10 -

defers to those reasons if they are reasonable." Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). Deciding whether a state court's "reasons . . . are reasonable," id., is not always a simple task. As we have noted in this and other contexts, "[r]easonableness is a concept, not a constant." McCambridge v. Hall, 303 F.3d 24, 36 (1st Cir. 2002) (en banc) (quoting United States v. Ocasio, 914 F.2d 330, 336 (1st Cir. 1990)).

Helpfully, the Supreme Court has prescribed some benchmarks to demarcate the boundaries of reasonableness under habeas review. First, "an 'unreasonable application of' [the Supreme Court's] holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice." White, 572 U.S. at 419 (quoting Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks omitted)). Second, the "unreasonable application" clause applies "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." Id. at 427 (quoting Harrington v. Richter, 562 U.S. 86, 103 (2011)). Finally, "evaluating whether a rule application was unreasonable requires considering the rule's specificity," such that "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

The second path to habeas relief runs through a showing that the state court decision "was based on an unreasonable determination of the facts" on the record before that court. 28 U.S.C. § 2254(d)(2). This demanding showing cannot be made when "'[r]easonable minds reviewing the record might disagree' about the finding in question." Brumfield v. Cain, 576 U.S. 305, 314 (2015) (alteration in original) (quoting Wood v. Allen, 558 U.S. 290, 301 (2010)). That said, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review." Id. (alteration in original) (quoting Miller-El v. Cockrell (Miller-El I), 537 U.S. 322, 340 (2003)).

Having crystallized this habeas lens, we turn to the Rhode Island Supreme Court's treatment of the petitioner's Batson claim. As a preliminary matter, though, it is useful to begin by sketching the Batson framework.

## A

By now, it is common ground that "[e]qual justice under law requires a criminal trial free of racial discrimination in the jury selection process." Flowers v. Mississippi, 139 S. Ct. 2228, 2242 (2019). To this end, the "Constitution forbids striking even a single prospective juror for a discriminatory purpose." Foster v. Chatman, 578 U.S. 488, 499 (2016) (quoting Snyder v. Louisiana, 552 U.S. 472, 478 (2008)). A "defendant has no right" to a jury of any specific racial composition, but the Equal Protection Clause

of the Fourteenth Amendment guarantees the "right to be tried by a jury whose members are selected by nondiscriminatory criteria." Powers v. Ohio, 499 U.S. 400, 404 (1991). In Batson and its progeny, the Court refined the process for determining whether a peremptory strike was discriminatory into three steps:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

Foster, 578 U.S. at 499 (quoting Snyder, 552 U.S. at 476-77).

The defendant "make[s] out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" Johnson v. California, 545 U.S. 162, 168 (2005) (quoting Batson, 476 U.S. at 93-94). At this first step, the defendant does not need to show "that the [peremptory] challenge was more likely than not the product of purposeful discrimination" but, rather, need only produce "evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." Id. at 170.

The second step of the Batson framework is concerned with "the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."

- 13 -

_Purkett_ v. _Elem_, 514 U.S. 765, 768 (1995) (per curiam) (quoting _Hernandez_ v. _New York_, 500 U.S. 352, 360 (1991) (plurality opinion)). Of particular pertinence here, the _Batson_ Court held that "the prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption — or his intuitive judgment — that they would be partial to the defendant because of their shared race." 476 U.S. at 97. Instead, the prosecutor "must articulate a neutral explanation related to the particular case to be tried." _Id._ at 98. A race-neutral explanation is a sine qua non under step two — and such an explanation will satisfy step two even if it is downright "implausible or fantastic." _Purkett_, 514 U.S. at 768.

It is only at the third step "that the persuasiveness of the justification becomes relevant." _Id._ Once that step is reached, the trial court must decide "whether the proffered [race-neutral] reasons are pretextual and the prosecutor instead exercised peremptory strikes on the basis of race." _Flowers_, 139 S. Ct. at 2244. "The ultimate inquiry is whether the State was 'motivated in substantial part by discriminatory intent.'" _Id._ (quoting _Foster_, 578 U.S. at 513).

**B**

Here, the Rhode Island Supreme Court first concluded that, because the prosecutor — unbidden — tendered an explanation

- 14 -

for the strike of Juror 103 and the trial justice considered that explanation in ruling on the Batson challenge, the antecedent question of whether the petitioner "had made a prima facie showing [became] moot." Porter I, 179 A.3d at 1226 (alteration in original) (quoting State v. Austin, 642 A.2d 673, 678 (R.I. 1994), in turn quoting Hernandez, 500 U.S. at 359 (plurality opinion)). Neither party takes issue with this ruling, so we move directly to the next step: whether the prosecutor carried his burden to proffer a race-neutral explanation.

The crux of the petitioner's Batson argument regarding Juror 103 — both on direct review in state court and in these federal habeas proceedings — is that the prosecutor stumbled at the second step by turning a blind eye to race neutrality and relying instead on race as the basis for the challenge to Juror 103.[2] We therefore focus our attention on Batson's second step, which is where the petitioner contends that the state court careened off the rails.

The Rhode Island Supreme Court found that, "[i]n regard to Juror 103, the prosecutor reasoned that a strike was necessary based on Juror 103's concerns — raised at the outset — about

_____

[2] In the court below, the respondent conceded that the petitioner had exhausted his remedies in the state courts, as required by 28 U.S.C. § 2254(b)(1)(A). The exhaustion requirement has thus been "expressly waive[d]." Id. § 2254(b)(3); see Pike, 492 F.3d at 71-72.

- 15 -

potential retaliation he could face as a juror in this case." Porter I, 179 A.3d at 1226. Consequently, it had "little difficulty" in deeming such reasoning "race-neutral" for purposes of the second step of the Batson framework. Id. The petitioner counters that the state court invented this explanation and, in the bargain, overlooked the prosecutor's stated reason for his strike of Juror 103: Juror 103 is "a member of the African-American community, the defendant at the bar is a member of the African-American community, [Juror 103 is] the only one on the panel who is, and if he were to vote guilty there could be consequences to it." Taking the prosecutor's words at face value, the petitioner thrice impugns the state court's decision: that the decision was "contrary to" clearly established Supreme Court precedent, 28 U.S.C. § 2254(d)(1); that it "involved an unreasonable application of" such precedent, id.; and that it "was based on an unreasonable determination of the facts in light of the evidence presented" in that proceeding, id. § 2254(d)(2).

Before we consider this asseverational array, we note a quirk: the relevant passages of the state court's opinion are terse to the point of obscuring the precise mechanics of its reasoning. That terseness, though, does not alter the outcome here. As we shall explain, the state court decision — depending on how it is read — either unreasonably applies Batson's second step or is premised on an unreasonable determination of the facts.

- 16 -

And there is no need to identify which of these roads the state court traveled because both of them lead to the same destination. Either way, the state supreme court's decision is not entitled to deference under AEDPA.

## 1

We first clear away some brush. The petitioner argues that the state court's decision was "contrary to" Batson's second step. 28 U.S.C. § 2254(d)(1). That argument is off-target.

The state court's opinion makes pellucid that, at step two of the Batson framework, the prosecutor bore the burden of articulating a "race-neutral reason" for the strike of Juror 103, such that his explanation must not have been facially and inherently discriminatory. Porter I, 179 A.3d at 1224-26. Thus, the state court extracted "the correct governing legal principle from [the Supreme] Court's decisions," and the petitioner cites no Supreme Court case reaching a different outcome "on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. It follows inexorably, as night follows day, that the Rhode Island Supreme Court's decision was not contrary to clearly established Supreme Court precedent.

## 2

The petitioner next argues that the state court's decision involved an unreasonable application of Batson's second

step.  See 28 U.S.C. § 2254(d)(1).  This argument hits closer to the mark.

We start with the rudiments.  An explanation for a strike that assumes a prospective juror's bias in favor of a defendant because both are members of the same race is not race-neutral under clearly established Supreme Court precedent.  The Batson Court explicitly held that "the prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption — or his intuitive judgment — that they would be partial to the defendant because of their shared race."  476 U.S. at 97; see Flowers, 139 S. Ct. at 2241 (describing this passage as among "the most critical sentences in the Batson opinion").  Among Batson's core teachings, then, is that "[r]ace cannot be a proxy for determining juror bias or competence."  Powers, 499 U.S. at 410.

Neither party disagrees with what we have just said.  Nor does the petitioner accuse the state court of disavowing those principles.  Rather, he contends that the state court's error lies in ignoring the prosecutor's words.  In the petitioner's view, "the prosecutor expressly made race a basis for his exercise of a peremptory challenge" and the state court found otherwise only because it did "not address the reasons proffered by the prosecutor for excusing [J]uror 103, to wit, the juror's race and the defendant's race."  Instead of grappling with the prosecutor's

- 18 -

stated reasons for the strike, the petitioner submits, the state court "identified other reasons that it said would have justified" striking Juror 103.

We think it luminously clear that if a state court's evaluation of racial neutrality focused upon a hypothetical, judicially contrived explanation for a peremptory strike rather than upon the explanation actually offered by the prosecutor, that court would unreasonably have applied step two of the Batson framework. The Supreme Court has squarely held that a post hoc judicial "substitution of a reason for eliminating [a prospective juror] does nothing to satisfy the prosecutors' burden of stating a racially neutral explanation for their own actions." Miller-El v. Dretke (Miller-El II), 545 U.S. 231, 252 (2005). To the extent that the state supreme court made that error here, it unreasonably applied Batson.

As proof that the state court impermissibly revised the prosecutor's actual explanation, the petitioner stresses that the opinion does not cite or discuss the prosecutor's eyebrow-raising comment that Juror 103 is "a member of the African-American community, the defendant at the bar is a member of the African-American community, [Juror 103 is] the only one on the panel who is, and if he were to vote guilty there could be consequences to it." We agree that the simplest explanation for this conspicuous void in the state court's opinion is that the state court assembled

- 19 -

its own rationale for the strike rather than examining the one put forth by the prosecutor.[3]  If that is what happened, then the state court unreasonably applied the Batson rule.

There is, of course, another possible explanation of the state court's decision.  We think it possible that the state court elided the prosecutor's race-explicit comment because it considered that isolated sentence unimportant or ancillary within the context of the prosecutor's somewhat circuitous speech.  Indeed, the gist of the argument presented in this court by the respondent's counsel is that this race-explicit comment was nothing but a "mere reference to the juror's race," not forming an essential part of the prosecutor's overall explanation for the strike.

So framed, the issue before us reduces to a question of fact, that is, how to parse the prosecutor's explanation.  We think this issue is more properly analyzed under section 2254(d)(2)'s rubric governing a state court's "determination of the facts."  28 U.S.C. § 2254(d)(2).  In Davis v. Ayala, for example, the Supreme Court held that a state court's "interpretation of the record"

---

[3] The trial justice apparently based his Batson ruling largely on the reasons that he would not want Juror 103 empaneled "if [the trial justice] were a lawyer in [the prosecutors'] seat."  As far as AEDPA goes, though, the trial justice's reasoning is immaterial: we review "the reasonableness of the 'last state-court adjudication on the merits of' the petitioner's claim."  Brown v. Davenport, 142 S. Ct. 1510, 1528 (2022) (quoting Greene v. Fisher, 565 U.S. 34, 40 (2011)).

implicated section 2254(d)(2) when a prosecutor offered both a "primary" and a "supplementary" reason for a peremptory strike, and the state court "interpreted the prosecutor's explanation of this strike to mean that" the primary reason was "alone sufficient to convince him to exercise [the] strike."  576 U.S. 257, 271, 274-75 (2015).  Following that approach, we take a second look at the prosecutor's explanation through the prism of section 2254(d)(2).

**3**

Under AEDPA, a federal court may issue the writ if the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  Curiously, the next provision of the statute adds that "a determination of a factual issue made by a State court shall be presumed to be correct" unless rebutted "by clear and convincing evidence."  Id. § 2254(e)(1).

Because these two provisions seem to address essentially the same scenario, some tension is apparent.  Courts long have grappled with "the question of how §§ 2254(d)(2) and (e)(1) fit together." Wood, 558 U.S. at 300.  The Supreme Court has carefully left that question open.  See id.  We have emulated the Court's example.  See Lucien v. Spencer, 871 F.3d 117, 127 n.4 (1st Cir. 2017).  Nevertheless, "this circuit has routinely held petitioners to the § 2254(e)(1) 'clear and convincing' standard" — although we

have never done so "in a case in which resolving the fit between the two sections would appear to have made any difference." Smith v. Dickhaut, 836 F.3d 97, 101 (1st Cir. 2016); see, e.g., Hollis v. Magnusson, 32 F.4th 1, 8 (1st Cir. 2022).

In all events, the question remains open in this circuit — and we need not decide it today. In this case, all roads lead to Rome: the outcome of our inquiry would be the same whether a habeas petitioner only has to show that the state court decision "was based on an unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2), or whether he also has to satisfy subsection (e)(1)'s "clear and convincing" standard. Assuming, without deciding, that this arguably more stringent standard applies, we conclude that the petitioner has satisfied it on the record before us. We explain briefly.

The Rhode Island Supreme Court's account of the prosecutor's explanation differs subtly, but importantly, from what appears in the transcript. According to the state court, "the prosecutor reasoned that a strike was necessary based on Juror 103's concerns — raised at the outset — about potential retaliation he could face as a juror in this case." Porter I, 179 A.3d at 1226. The court thus recast the prosecutor's explanation as though he were simply parroting or amplifying Juror 103's own comments. But the prosecutor's actual explanation was far more pointed and, at bottom, turned on his mistrust of Juror 103's professed capacity

to be fair and impartial — a mistrust that he explained in significant part on the ground that the petitioner and Juror 103 were both black.

The prosecutor's explanation involved two basic stages. He began by summarizing Juror 103's articulated fear of "[b]low-back and concern, based on his verdict." He immediately proceeded to superimpose a distorted racial gloss on Juror 103's words, explaining that "the State's take" on Juror 103's hesitation was that "he's a member of the African-American community, the defendant at the bar is a member of the African-American community, [Juror 103 is] the only one on the panel who is, and if he were to vote guilty there could be consequences to it." But — notably — Juror 103 had never mentioned race or even hinted that it figured into his concerns about workplace retaliation.

Building on this porous foundation, the prosecutor moved along to the main thrust of his rationale: he said that "common sense indicates" that Juror 103 was anxious solely about a potential guilty verdict and that he would not face "any consequence" for voting not guilty. The prosecutor then wrapped up his explanation by noting that Juror 103 said he might be adversely "affect[ed]" if someone in his workplace discovered that he voted guilty and that "although he said he could deliver a verdict, quite frankly, [the prosecution] still think[s] it's a

concern for him, and based on that, we would ask to excuse the juror."[4]

The prosecutor's reason for the strike did not mirror Juror 103's stated concerns. It purported to dig below the surface of what Juror 103 had articulated, supposedly unearthing a hidden layer of bias against finding the defendant guilty — notwithstanding Juror 103's explicit disclaimer of any such bias. And the prosecutor used race as his shovel to dig there.

We do not think that the transcript reasonably can be read as the respondent proposes, interpreting the prosecutor's "reference" to the shared race of Juror 103 and the petitioner as though dwelling on that commonality was merely an irrelevant aside or piece of weightless fluff.[5] Instead, the record shows that the

---

[4] The prosecutor spoke simply of "a verdict" in this sentence, but we think it plain from the context that he meant "a fair verdict." This sentence evidently picks up on the prosecutor's remarks at the beginning of his explanation for striking Juror 103: "[a]lthough the . . . juror did say he could be, quote, fair . . . and even when the Court ultimately asked him the last question before the sidebar was ended with, 'As you sit here now, can you be fair?' And he said, 'Yes,' the State bases its challenge on the following."

[5] To support this reading, the respondent notes that defense counsel's on-the-spot Batson objection did not specifically highlight the prosecutor's racial remark as evidence that his explanation was other than race-neutral. This omission, the respondent suggests, indicates that even defense counsel did not attach particular significance to the prosecutor's comment. This is little more than whistling past the graveyard. Defense counsel's Batson objection was swift and unequivocal, and we do not find anything in it that throws shade upon our reading of the prosecutor's explanation.

prosecutor's racial observation underpinned the chief reason given for the strike:  the assumption that Juror 103 was predisposed against a guilty verdict in particular.

Trying to pretty up this pig with lipstick, the respondent suggests a reading of the prosecutor's explanation that locates his suspicions about Juror 103's partiality in Juror 103's own comments.  The prosecutor did allude to his prior exchange with Juror 103 and asserted that he "would infer from the record that all of [Juror 103's] concern is, quote, towards a guilty verdict."  But in the same breath, the prosecutor said that the record was silent as to whether Juror 103 would similarly be concerned about a verdict of not guilty; he thus reverted to "common sense" to justify his suspicion that Juror 103 feared only a guilty verdict.  And the prosecutor summed up his explanation for the strike by stating that he "quite frankly" did not believe Juror 103's self-declared impartiality.

We see no reasonable reading of the prosecutor's explanation as resting on Juror 103's own words.  Instead, the explanation was framed as a counterpoint to what Juror 103 had in fact articulated.  The prosecutor reasoned that "common sense" and the would-be juror's racial affinity with the petitioner cast doubt on Juror 103's claim to fairness and, "based on that," exercised the strike.  To the extent the state court interpreted the record differently, we consider that interpretation an "unreasonable

determination of the facts," 28 U.S.C. § 2254(d)(2), and are persuaded by "clear and convincing evidence" that it is incorrect, id. § 2254(e)(1).

Rejecting similar arguments that a prosecutor's race-based reasoning for a strike could be read as an innocuous digression embedded within a valid justification, other courts have held that state court decisions deeming such explanations race-neutral unreasonably applied Batson. See, e.g., Walker v. Girdich, 410 F.3d 120, 123-24 (2d Cir. 2005) (rejecting argument that "prosecutor's statements that [prospective juror] 'was black' and . . . had 'no family' were merely descriptive" when "the prosecutor's words and phrasing adduce[d] these characteristics as grounds for the peremptory challenge"); Ricardo v. Rardin, 189 F.3d 474, 1999 WL 561595, at *2 (9th Cir. 1999) (unpublished table decision) (holding that prosecutor's explanations for striking two jurors "rel[ied] exclusively on assumptions based on race"). This case demands the same result — and we think that is so even when arguments of this kind about interpretations of the record are examined as factual determinations under section 2254(d)(2).

To cinch the matter, the state court's decision that the prosecutor's explanation was race-neutral "was based on" this unreasonable interpretation. Id. § 2254(d)(2). With the voir dire transcript read as we think any reasonable jurist must read it, the Batson violation leaps off the page. The only reason given

for the prosecutor's suspicion that Juror 103 was disinclined to vote guilty — aside from "common sense" — was "the State's take" that "he's a member of the African-American community, the defendant at the bar is a member of the African-American community, [Juror 103 is] the only one on the panel who is, and if he were to vote guilty there could be consequences to it." The prosecutor's reason thus echoes the discredited justification for striking "jurors of the defendant's race on the assumption — or [the] intuitive judgment — that they would be partial to the defendant because of their shared race." Batson, 476 U.S. at 97. In reaching a contrary conclusion, the state court parsed the prosecutor's words unreasonably.

## C

Having decided that the state court must have either unreasonably applied Batson or based its decision on an unreasonable determination of the facts, we must now inquire (without any habeas deference) whether the writ shall issue. A habeas petitioner ultimately must show that he "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). It follows that the petitioner "may not obtain habeas relief if, applying the correct Batson standard, he would still not prevail on his claim." Aspen v. Bissonnette, 480 F.3d 571, 576 (1st Cir. 2007).

We approach the state court record de novo, see id., but we review the trial court's Batson findings for clear error, see Snyder, 552 U.S. at 477; United States v. Lara, 181 F.3d 183, 193-94 (1st Cir. 1999). Clear error will be found only if, after review of the record as a whole, "an inquiring court 'form[s] a strong, unyielding belief that a mistake has been made.'" United States v. Cintrón-Echautegui, 604 F.3d 1, 6 (1st Cir. 2010) (alteration in original) (quoting Cumpiano v. Banco Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990)).

For the reasons already discussed, we hold that the prosecutor's explanation was inherently discriminatory and, thus, not race-neutral under Batson's second step. The trial justice clearly erred in concluding otherwise. See United States v. Wilson, 884 F.2d 1121, 1124 (8th Cir. 1989) (en banc) (holding that trial court clearly erred in treating as racially neutral prosecution's explanation for strike "that [the black defendant's] friends were more likely to contact . . . a black [juror] than . . . a white" one). Where the trial court already has found a prima facie case of discrimination at step one, the prosecutor's failure to put forth a neutral explanation for his strike at step two will consummate the constitutional violation and the petitioner's conviction will be set aside. See Batson, 476 U.S. at 100. Reversal of the conviction is automatic because, as we have held, a completed Batson violation is a "structural error"

that defies harmless-error analysis.  Sanchez v. Roden, 753 F.3d 279, 307 (1st Cir. 2014) (citing Scarpa v. Dubois, 38 F.3d 1, 14 (1st Cir. 1994)); see Weaver v. Massachusetts, 137 S. Ct. 1899, 1911 (2017).

Here, however, there is a wrinkle.  Because the prosecutor launched into his (ill-conceived) explanation for striking Juror 103 before any Batson challenge was made, no prima facie case was ever found.  We must therefore proceed to "[t]he ultimate inquiry" in the Batson milieu, whether the petitioner has proven that "the State was 'motivated in substantial part by discriminatory intent'" in striking Juror 103.  Flowers, 139 S. Ct. at 2244 (quoting Foster, 578 U.S. at 513).

We believe that the petitioner has carried this burden and that the trial justice's contrary finding was clearly erroneous.  The prosecutor's frankly race-explicit explanation, coupled with the fact that Juror 103 was the only African-American in the venire, leaves us with the strong belief that the prosecutor struck Juror 103 substantially because of his race.[6]

---

[6] The Supreme Court has left open the possibility that the respondent might be able to prevail by showing that the prosecution's discriminatory intent was "'a substantial or motivating factor' behind a strike" but "was nevertheless not 'determinative' to the prosecution's decision to exercise the strike." Foster, 578 U.S. at 513 n.6 (quoting Snyder, 552 U.S. at 485).  We need not address this possibility because, here, as in Foster, the respondent has advanced no such argument. See id.  We add, moreover, that the record does not establish that showing on its own; and there is no "realistic possibility that this subtle

We need go no further.  For the reasons elucidated above, the decision of the district court is **reversed**.  The case is **remanded** to the district court with instructions to grant the habeas writ, ordering the state courts to vacate the petitioner's convictions and, unless he is tried anew within ninety days of the district court's order, to release him.  See Foxworth v. Maloney, 515 F.3d 1, 2 (1st Cir. 2008); see also Hilton v. Braunskill, 481 U.S. 770, 775 (1987) ("[F]ederal courts may delay the release of a successful habeas petitioner in order to provide the State an opportunity to correct the constitutional violation found by the court.").

**Reversed and Remanded**.

question of causation could be profitably explored further on remand at this late date."  Snyder, 552 U.S. at 485-86.